**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**<u>CASE MANAGEMENT TRACK DESIGNATION FORM</u>**

| | | |
|---|---|---|
| SAFSTOR REAL ESTATE CO., LLC | : | CIVIL ACTION |
| v. | : | |
| 4890 SUMMERDALE ASSOCIATES, LP | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.    ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.    ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.    ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)    ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.    (X)

| | | |
|---|---|---|
| <u>3/12/2019</u> | <u>Tara S. Sarosiek</u> | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| <u>615-252-3522</u> | <u>615-252-6380</u> | <u>tsarosiek@bradley.com</u> |
| **Telephone** | **FAX Number** | **E-Mail Address** |

**(Civ. 660) 10/02**

JS 44   (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| SAFStor Real Estate Co, LLC | 4890 Summerdale Associates, LP |

| | |
|---|---|
| (b) County of Residence of First Listed Plaintiff   Volusia County, Florida<br>*(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant   Philadelpha County, PA<br>*(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |
| (c) Attorneys *(Firm Name, Address, and Telephone Number)*<br><br>Tara Sarosiek, Bradley Arant Boult Cummings LLP, 1600 Division St., Suite 700, Nashville, TN 37203; 615-244-2582 | Attorneys *(If Known)* |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☒ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br><br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |
| | | | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332(a)(1)
Brief description of cause:
Complaint for specific performance

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.     DEMAND $ _____     CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*     JUDGE _____     DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 03/12/2019 | *(signature)* |

**FOR OFFICE USE ONLY**

| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|
| | | | | |

JS

19-1065

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: 444 Seabreeze Blvd., Suite 840, Daytona Beach, FL 32118

Address of Defendant: 9835 Verree Road, Philadelphia, PA 19115-1927

Place of Accident, Incident or Transaction: 4890 Summerdale Avenue, Philadelphia, PA

---

**RELATED CASE, IF ANY:**

Case Number: _____  Judge: _____  Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?  Yes ☐  No ☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?  Yes ☐  No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?  Yes ☐  No ☐

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?  Yes ☐  No ☐

I certify that, to my knowledge, the within case ☐ is / ☒ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE 3/13/2019  _Attorney-at-Law / Pro Se Plaintiff_  208598  Attorney I D # (if applicable)

---

**CIVIL: (Place a √ in one category only)**

**A. Federal Question Cases:**

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☐ 7. Civil Rights
☐ 8. Habeas Corpus
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☐ 11. All other Federal Question Cases *(Please specify)*

**B. Diversity Jurisdiction Cases:**

☒ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify)*
☐ 7. Products Liability
☐ 8. Products Liability – Asbestos
☐ 9. All other Diversity Cases *(Please specify)*

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration)*

I, Tara S. Sarosiek, counsel of record or pro se plaintiff, do hereby certify

☒ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs.

☐ Relief other than monetary damages is sought.

DATE 03/12/2019  _Attorney-at-Law / Pro Se Plaintiff_  208598  Attorney I D # (if applicable)

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F R C P 38

Civ 609 (5/2018)

MAR 13 2019

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SAFSTOR REAL ESTATE CO, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CIVIL ACTION NO: _____ |
| | ) |
| v. | ) |
| | ) |
| 4890 SUMMERDALE ASSOCIATES, LP, | ) JURY DEMAND |
| | ) |
| Defendant. | ) |

## COMPLAINT

SAFStor Real Estate Co, LLC ("SAFStor" or "Plaintiff"), by and through its attorneys, for its complaint against 4890 Summerdale Associates, LP ("Defendant"), states as follows:

## PARTIES

1.      SAFStor is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located in Daytona Beach, Florida.

2.      Andrew Young is the sole member of SAFStor.  Mr. Young is a citizen of and domiciled in the State of Florida.

3.      Defendant is a limited partnership organized and existing under the laws of the State of Pennsylvania with its principal place of business located in Philadelphia, Pennsylvania.

4.      Upon information and belief, the partners of Defendant are not citizens of or domiciled in the State of Florida.

5.      4890 Summerdale General Partnership, LLC is the general partner of Defendant. 4890 Summerdale General Partnership LLC is a limited liability company organized and existing under the laws of the State of Pennsylvania with its principal place of business located in Philadelphia, Pennsylvania.

4816-2170-6121.5                                    1

6.      Plaintiff conducted a reasonable inquiry to determine the partnership of Defendant and the membership of 4890 Summerdale General Partnership, LLC by consulting publicly available sources and found no connection with the State of Florida.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this matter, pursuant to 28 U.S.C. § 1332(a)(1), because: (a) the amount in controversy exceeds $75,000, exclusive of interest and costs; and (b) there is complete diversity between SAFStor and Defendant.

8.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this district and the property at issue is located in this district.

## FACTUAL ALLEGATIONS

9.      SAFStor and Defendant are parties to a Purchase and Sale Agreement (the "Agreement") with an effective date of January 28, 2019, whereby SAFStor agreed to purchase and Defendant agreed to sell certain real property located at 4890 Summerdale Avenue in Philadelphia, Pennsylvania (the "Property"). A copy of the Agreement is attached hereto as **Exhibit A**.

10.     SAFStor is a provider of community-centered storage solutions. It develops and manages single and multi-story self-storage properties in targeted markets across the United States. Key to the company's success is its site selection process. Using its own proprietary software, SAFStor heavily scrutinizes and researches each targeted site before selection, assessing such factors as total populations, number and size of households, household income levels, homeowners versus renters, traffic counts, and competition in specified radiuses to the targeted site. Significantly, this process allows SAFStor to meet the needs of its customers and the community while providing a consistent return-on-investment with each property.

4816-2170-6121.5                                    2

11.     Beginning in 2018, SAFStor identified Philadelphia as a potential market and began looking for properties in the Philadelphia area.

12.     After extensive research of potential sites, SAFStor determined that the Property met its criteria for development.

13.     In particular, SAFstor determined that the Property was unique in that market and had a high potential value for its business. The Property is located within the city limits of Philadelphia and thus any development would enjoy a full tax abatement. The Property is also fully entitled, meaning that the path from going under contract to construction and ultimately monetizing the business would be relatively clear and low risk for SAFStor, and not subject to the uncertainty of government approvals. Moreover, based on SAFStor's calculated metrics regarding the site, the Property sits in a high-demand area with very little surrounding competition and low market risk. It is also located close to other retailers and access points.

14.     In mid-December 2018, following discussions with Defendant, where Defendant represented that the Property was available for purchase, SAFStor provided Defendant with a draft purchase and sale agreement for the Property.

15.     On or about January 23, 2019, Defendant sent SAFStor a revised agreement.

16.     Following further discussions and negotiations, the parties executed the Agreement on January 28, 2019.

17.     Under the terms of the Agreement, SAFStor agreed to buy and Defendant agreed to sell the Property for a purchase price of $1,500,000.00, subject to certain terms and conditions.

18.     Specifically, under Section 12 of the Agreement, Defendant represented and warranted that it had "legal authority and capacity to enter into th[e] Agreement and to sell the Property."

4816-2170-6121.5                                    3

19.    Defendant further represented that "[n]o leases, options or other contracts for the Property have been granted or entered into which are outstanding as of the date of th[e] Agreement."

20.    Critically, Defendant also agreed under Section 18 of the Agreement that "[w]hile th[e] Agreement is in effect, [it] will not actively market, sell or encumber the Property in any manner, [and] will not accept, negotiate or entertain any other offers for the Property."

21.    SAFStor relied on Defendant's representations that Defendant had legal authority and capacity to sell the Property and that Defendant would not market, sell or encumber the Property while the Agreement was in effect.

22.    After finalizing the Agreement, SAFStor deposited the amount of $40,000.00 in earnest money into escrow pursuant to the terms of the Agreement. It also began conducting due diligence and arranging for inspections as contemplated under the Agreement.

23.    However, shortly after signing the Agreement, counsel for Defendant requested a telephone call with counsel for SAFStor. During that call, Defendant's counsel disclosed, *for the first time*, that there was another buyer for the Property.

24.    Following further discussions, SAFStor learned that Defendant had entered into an agreement to sell the Property to the other buyer.

25.    On or about February 12, 2019, SAFStor sent a notice of default to Defendant. A copy of the Notice of Default is attached hereto as **Exhibit B**. SAFStor notified Defendant that it was in breach of the Agreement and demanded that Defendant cure its breach and perform under the Agreement. Defendant has not cured its breach of the Agreement.

## COUNT I (SPECIFIC PERFORMANCE)

26.    The allegations in paragraphs 1-25 of this Complaint are incorporated herein by reference.

4816-2170-6121.5

4

27.     Plaintiff and Defendant entered into a valid contract for the sale of real estate.

28.     Under the terms of the Agreement, Plaintiff agreed to purchase and Defendant agreed to sell the Property for a purchase price of $1,500,000.00.

29.     Plaintiff is willing and ready to perform under the Agreement.

30.     Under Section 14 of the Agreement, the Parties expressly provided for specific performance of the Agreement in the event of default by the Seller.

31.     Plaintiff requests that the Court enter judgment for specific performance under the Agreement requiring Defendant to perform as contemplated by the Agreement.

## COUNT II (BREACH OF CONTRACT)

32.     The allegations in paragraphs 1-31 of this Complaint are incorporated herein by reference.

33.     Pursuant to the Agreement, Defendant agreed to sell the Property to Plaintiff.

34.     Under Section 12 of the Agreement, Defendant represented and warranted that it had "legal authority and capacity to enter into th[e] Agreement and to sell the Property." Defendant further represented that "[n]o leases, options or other contracts for the Property have been granted or entered into which are outstanding as of the date of th[e] Agreement."

35.     Under Section 18 of the Agreement, Defendant also agreed that "[w]hile th[e] Agreement is in effect, [it] will not actively market, sell or encumber the Property in any manner, [and] will not accept, negotiate or entertain any other offers for the Property."

36.     Defendant breached the Agreement by entering into a contract to sell the Property while the Agreement with Plaintiff was in effect.

37.     Plaintiff has complied with all conditions and obligations required by the Agreement and is not in breach of the Agreement.

38.     Plaintiff has suffered damages as a result of Defendant's breach of the Agreement in a sum that exceeds the minimum jurisdiction of this Court.

39.     Plaintiff requests that the Court enter judgment for its damages against Defendant, including but not limited to all actual, incidental and consequential damages.

## COUNT III (FRAUDULENT MISREPRESENTATION)

40.     The allegations in paragraphs 1-39 of this Complaint are incorporated herein by reference.

41.     Defendant represented to Plaintiff that it had legal authority and capacity to sell the Property and that Defendant would not market, sell or encumber the Property while the Agreement was in effect.

42.     Defendant's representations were material and false.  Upon information and belief, Defendant was under contract with another buyer for the Property when Defendant entered into the Agreement with Plaintiff for the sale of the Property.

43.     Defendant made these misrepresentations with knowledge as to their false and misleading nature.  Alternatively, Defendant made these misrepresentations with reckless disregard to their truth.

44.     Defendant made these misrepresentations with the intention that they should be acted upon by Plaintiff.

45.     Plaintiff justifiably relied on Defendant's misrepresentations and was induced to enter into the Agreement.

46.     In reliance on Defendant's misrepresentations, Plaintiff has suffered injury in a sum that exceeds the jurisdictional minimum of this Court, including but not limited to, its damages associated with its performance under the contract, its lost business opportunities and lost profits related to its business and the development of the Property.

4816-2170-6121.5                                              6

47.     Plaintiff requests that the Court grant judgment for its damages against Defendant, including but not limited to all actual, incidental, and consequential damages, as well as punitive damages as a result of Defendant's intentional, malicious, and egregious conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment in its favor and against Defendant as follows:

(1)     Enter judgment for specific performance under the Agreement requiring Defendant to perform as contemplated by the Agreement;

(2)     Enter judgment against Defendant for damages Plaintiff has suffered in an amount over $8,000,000.00, plus punitive damages in the maximum amount permitted by law;

(3)     Award Plaintiff its reasonable attorney's fees and costs;

(4)     Award Plaintiff pre-judgment and post-judgment interest;

(5)     Grant Plaintiff a jury trial on all issues so triable; and

(6)     Grant Plaintiff any and all other relief to which it appears entitled.

4816-2170-6121.5

7

Dated: March 12, 2019

Respectfully submitted,

**BRADLEY ARANT BOULT CUMMINGS LLP**

Tara S. Sarosiek, PA ID No. 208598
1600 Division Street, Suite 700
Nashville, Tennessee 37203
(615) 252-3522
tsarosiek@bradley.com

Brian A. Wahl
*Pro hac vice application forthcoming*
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203
(205) 521-8593
bwahl@bradley.com

*Attorneys for Plaintiff SAFStor*
*Real Estate Co, LLC*

# EXHIBIT A

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (this "Agreement") is made this 28th day of January, 2019 (the "Effective Date"), by and between **4890 Summerdale Associates, LP**, a Pennsylvania limited partnership ("Seller"), and **SAFStor Real Estate Co, LLC**, a Delaware limited liability company ("Purchaser").

### Recitals

A.    Seller is the owner of that certain real property located at 4890 Summerdale Avenue in Philadelphia, Philadelphia County, Pennsylvania, and further identified in the Philadelphia Tax Records as OPA#884121000 (the "Entire Parcel").

B.    Purchaser desires to purchase from Seller and Seller desires to sell to Purchaser a certain portion of the Entire Parcel consisting of approximately two (2) useable acres of unimproved land, as generally identified and depicted on Exhibit A attached hereto and made a part hereof (the "Property") pursuant to the terms and conditions of this Agreement.

### Agreement

**NOW, THEREFORE**, in consideration of the above Recitals and other good and valuable consideration, including the mutual covenants and promises herein contained, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

1.    **PROPERTY.**  Seller agrees to sell and Purchaser agrees to buy the Property together with all improvements, easements, licenses, privileges, appurtenances, water rights and other rights pertaining thereto, including without limitation all air or air space rights, all subsurface rights, all riparian rights, all title and interest of Seller in and to adjacent roads, rights of way, alleys, drainage facilities, utility facilities, impact fee credits, concurrency rights, development rights, sewer or water reservations or tap-in rights, and any and all similar development rights incident or related thereto. The final legal description for the Property shall be as set forth on the Survey (as defined in Section 5(a)). The parties hereby acknowledge that the Property is being sold "As-Is" and "Where-Is", and without any representations or warranties on the part of Seller except for those expressly set forth herein.

2.    **PURCHASE PRICE.**  The purchase price for the Property shall be One Million Five Hundred Thousand Dollars ($1,500,000.00) (the "Purchase Price"), to be paid as hereinafter provided.

3.    **EARNEST MONEY.**

a.    Purchaser will deposit with First American Title Insurance Company or another title company acceptable to Purchaser that is licensed to transact business in Pennsylvania (the "Title Company") within five (5) business days after the Effective Date, wired funds in the amount of Forty Thousand Dollars ($40,000.00). The deposit, any additional deposits made

1

PSA (Philadelphia, PA - Summerdale Ave.)

4832-3299-3922.4

pursuant to Section 4(c), and interest thereon, if any, shall be defined collectively as the "Earnest Money."

b.      Upon collection of the funds into the general escrow account of the Title Company, such funds are to be disbursed by the Title Company in accordance with the terms of this Agreement and, if requested by Purchaser, held in an interest-bearing trust account. Prior to opening such investment, in addition to the funds being collected, Purchaser, as depositor, will furnish the forms required to open the investment (an executed Form W-9 and INSTRUCTION FOR INVESTMENT OF ESCROW FUNDS).

c.      The Earnest Money shall be applied to the Purchase Price to be paid by Purchaser at Closing or disbursed as otherwise provided herein.

4.      **INSPECTION PERIOD; ENTITLEMENTS PERIOD; SUBDIVISION.**

a.        During the term of this Agreement:

i.        Purchaser, its employees, agents and designees, shall have the right of ingress and egress over and through the Entire Parcel during normal business hours and upon twenty-four hours' (24) prior notice to Seller to perform any inspections deemed necessary by Purchaser to evaluate the Property; provided, however that any invasive testing and/or Phase II or similar type testing must be approved in advance by Seller (which approval will not be unreasonably withheld, conditioned or delayed). Additionally, Seller or Seller's representative shall have the right to be present during any and all inspections. Purchaser shall maintain, and shall ensure that any inspector or contractor that tests or inspects the Property shall maintain, public liability and property damage insurance; and proof of such insurance covering the Purchaser (and reflecting Seller as an additional insured) shall be provided to Seller prior to such parties entering upon the Property.   Each such insurance policy shall be in the minimum amount of One Million Dollars ($1,000,000) per occurrence for injury to or death of one or more persons in an occurrence, and for damage to tangible property (including loss of use) in an occurrence.

ii.       Purchaser shall indemnify and hold Seller harmless from any liability arising out of the entry of Purchaser and/or Purchaser's agents or technical advisors on the Property prior to Closing; and, further to the extent that any of Purchaser's inspections or testing alter, damage or otherwise change the Property, Purchaser shall be responsible to promptly restore the Property to the condition in which it existed prior to such inspections.

iii.      Seller shall cooperate with Purchaser by responding, to the best of Seller's knowledge, to all reasonable questions and inquiries made by Purchaser relating to the Property, by obtaining all documents, at no cost to Seller, that are reasonably necessary in Purchaser's opinion for Purchaser to evaluate the use of the Property as a self-storage facility, and by instructing its agents and advisors to disclose any information they may have pertaining to the Property. Seller agrees to provide to Purchaser within five (5) days of a request therefor any affidavits or letters executed by Seller that may be reasonably required by the applicable governmental authorities and utilities to authorize Purchaser and its agents to sign and execute on behalf of Seller any documents necessary to initiate and pursue any rezoning, replatting and/or development of the Property.

2

PSA (Philadelphia, PA - Summerdale Ave.)

4832-3299-3922.4

b.    Purchaser, its employees, agents and designees, shall have the right to inspect the Property and all information related thereto for ninety (90) days after the Effective Date (the "Inspection Period"). Within five (5) days following the Effective Date, Seller shall deliver to Purchaser those items listed on Exhibit B attached hereto and made a part hereof, which Seller has in its possession or which it may be able to reasonably obtain (the "Existing Due Diligence"). Seller acknowledges that the Existing Due Diligence is critical to Purchaser's inspections of the Property, and as a result, the Inspection Period will be extended automatically one day for each day that the delivery of the Existing Due Diligence is delayed past the required delivery date set forth herein.  Seller shall have an obligation to continue to comply with disclosing any additional items of Existing Due Diligence to Purchaser promptly as they become available.  Purchaser may elect not to buy the Property for any reason at all or for no reason during the Inspection Period by providing Seller with written notice of Purchaser's intention not to purchase the Property prior to the end of the Inspection Period.  If Purchaser so elects not to purchase the Property and provides written notice of such election to Seller when required, then the Title Company, upon written demand by Purchaser (with a copy going to Seller), shall refund the Earnest Money to Purchaser within 5 business days of receipt by Title Company of said written demand.  In the event that Purchaser elects not to purchase the Property or this Agreement is otherwise terminated, Purchaser shall immediately return or destroy all items of Existing Due Diligence provided by Seller, and shall not retain any copies.

c.    Purchaser intends to develop the Property as a self-storage facility, together with on-site parking, signage, amenities and other support and accessory uses, all to be described on Purchaser's development plan (the "Intended Use"). If Purchaser does not properly terminate this Agreement prior to the expiration of the Inspection Period, within ten (10) days after the last day of the Inspection Period, Purchaser shall deliver an additional Forty Thousand Dollars ($40,000.00) to the Title Company, which additional funds will become a part of the Earnest Money hereunder. Immediately after the end of the Inspection Period, if Purchaser has not terminated this Agreement, Purchaser shall have an additional one hundred fifty (150) day period (the "Entitlements Period") to obtain the appropriate utility and governmental approvals and entitlements (including any subdivision and zoning approvals) for the Intended Use (collectively, the "Approvals"). If needed to continue the process of obtaining the Approvals for the Intended Use, Purchaser shall have the right to extend the Entitlements Period for three (3) 30-day periods by giving written notice thereof to Seller prior to the expiration of the then applicable Entitlements Period for each extension, and by delivering an additional Fifteen Thousand Dollars ($15,000.00) to the Title Company for each such extension within one (1) business day after notifying Seller of such extension, which additional funds will become a part of the Earnest Money hereunder. If Purchaser is unable to obtain any of the Approvals necessary for the Intended Use, Purchaser may terminate this Agreement by providing Seller and the Title Company with written notice of Purchaser's intention not to purchase the Property prior to the end of the Entitlements Period.  If Purchaser so elects to terminate this Agreement, then the Title Company, upon written demand by Purchaser (with a copy going to Seller), shall refund the Earnest Money to Purchaser within five (5) business days of receipt by Title Company of said written demand. If Purchaser elects to terminate this Agreement after the end of the Inspection Period and prior to the end of the Entitlements Period for any reason other than Purchaser's failure to obtain any of its Approvals or any other termination right described in Sections 5(b), 5(c), 14(a) and 15, the Title Company, upon written notice by Purchaser or Seller, shall release

3

the Earnest Money to Seller within five (5) business days of receipt by Title Company of said written demand.    If Purchaser does not terminate this Agreement before the end of the Entitlements Period, all Earnest Money deposited by Purchaser shall be nonrefundable except as provided in Sections 5(b), 5(c), 14(a) and 15.

      d.      Purchaser will be responsible for taking all actions necessary to cause the Property to be separated and subdivided from the Entire Parcel so that the Property is a legal, insurable lot prior to Closing.  Such subdivision or lot split process shall be completed by Purchaser prior to the Closing.  Seller agrees to cooperate with Purchaser in connection with the subdivision process described herein, including signing any applications or other documents necessary to initiate and complete the subdivision process.  Promptly after any request from Seller, Purchaser shall provide to Seller copies of all submittals related to the subdivision process described herein and respond to any inquiries from Seller regarding the status of Purchaser's progress in finalizing the subdivision documents and having them approved by the applicable governmental authorities for recordation.

## 5.      TITLE AND SURVEY.

      a.      Purchaser shall obtain (i) a title insurance commitment for the Property (the "Title Commitment") issued by the Title Company in the amount of the Purchase Price, committing to insure Purchaser against loss on account of any defect or encumbrance in the title, unless herein excepted and (ii) an ALTA survey of the Property, certified to Purchaser and the Title Company in accordance with Purchaser's survey requirements (the "Survey").

      b.      The Property is being sold and is to be conveyed subject to any specific matters set forth in the Title Commitment and the Survey unless written objections of the same (the "Title Objections") are delivered to Seller prior to the end of the Inspection Period. Seller shall have fifteen (15) business days after receipt of the Title Objections and a copy of the Title Commitment (the "Seller Response Period") to either cure the Title Objections or notify Purchaser of which Title Objections Seller will and will not cure. Any matters reflected in the Title Commitment and Survey that are not objected to prior to the end of the Inspection Period shall be deemed "Permitted Exceptions." Should Seller notify Purchaser that Seller will not cure any timely made Title Objections or should Seller fail to timely cure any timely made Title Objections, Purchaser shall have the right to (i) accept said uncured Title Objections and close on the Property, in which case said uncured Title Objections shall be "Permitted Exceptions" or (ii) terminate this Agreement upon written notice to Seller within thirty (30) days after the expiration of the Seller Response Period and receive a full refund of the Earnest Money within five (5) business days of receipt by Title Company of said written notice.

      c.      If any update to the Title Commitment or Survey prior to Closing reveals any new encumbrance, lien, outstanding interest or question of title which was not created or caused to be created by Purchaser, then Purchaser shall have the right to object to the same in writing to Seller (the "Subsequent Title Objections"). Seller shall have until the earlier to occur of five (5) days prior to Closing or five (5) days following receipt of the Subsequent Title Objections to either cure the Subsequent Title Objections or notify Purchaser of which Subsequent Title Objections Seller will and will not cure. Any matters reflected in any updated Title Commitment and Survey that are not objected to by Purchaser shall be deemed "Permitted Exceptions." Should Seller notify Purchaser that Seller will not cure any Subsequent Title Objections or should Seller fail to

4

PSA (Philadelphia, PA - Summerdale Ave.)

4832-3299-3922.4

timely cure any Subsequent Title Objections, Purchaser shall have the right to (i) accept said uncured Subsequent Title Objections and close on the Property, in which case said uncured Subsequent Title Objections shall be "Permitted Exceptions" or (ii) terminate this Agreement upon written notice to Seller prior to Closing and receive a full refund of the Earnest Money within five (5) business days of receipt by Title Company of said written notice.

   d.  Notwithstanding anything contained herein to the contrary, Seller covenants and agrees to satisfy any and all monetary liens at the time of Closing.

**6.**  **CONVEYANCE.** Seller agrees to convey to Purchaser fee simple marketable title to the Property, together with all easements, rights of way, privileges, appurtenances and other rights pertaining thereto, by special warranty deed subject only to the Permitted Exceptions (the "Deed").

**7.**  **CONDITIONS PRECEDENT TO CLOSING.** The obligations of Purchaser and Seller under this Agreement are subject to all covenants, agreements, actions, proceedings, instruments and documents required pursuant to this Agreement having been performed, complied with or delivered (as the case may be) in accordance with this Agreement.

**8.**  **CLOSING.** The closing of the sale and purchase of the Property (the "Closing") shall take place sixty (60) days after the date on which Purchaser receives the grading permit approval by the applicable governmental authority for the Intended Use at the Property, or on such earlier date as may be designated by Purchaser upon at least ten (10) business days' advance written notice to Seller (the "Closing Date"). The Closing shall take place at the offices of the Title Company and shall be conducted pursuant to an escrow-style closing through the Title Company (or such other party selected by Purchaser and Seller) so that it will not be necessary for any party to physically attend the Closing.

**9.**  **DELIVERIES AT CLOSING.** At the Closing, Seller shall deliver those certain items listed on Exhibit C. At the Closing, Purchaser shall deliver a closing statement executed by Purchaser, any documents expressly contemplated in this Agreement, any documents reasonably required of it from the Title Company in order to close, and immediately available funds due from Purchaser pursuant to the closing statement.

**10.**  **COSTS AND FEES.** Seller shall be responsible for one-half of the documentary stamps and/or applicable real estate transfer taxes, one-half of any closing or escrow fee charged by the Title Company, and any other costs not described herein customarily borne by a seller in commercial real estate transactions in the county where the Property is located. Purchaser shall be responsible for the payment of the title insurance premium for Purchaser's owner's title insurance policy (and the title search and abstract fees associated with said title insurance policy), the cost of the Survey, one-half of the documentary stamps and/or applicable real estate transfer taxes, all recording fees, the cost of any other third party reports obtained by Purchaser, one-half of any closing or escrow fee charged by the Title Company, and any other costs not described herein customarily borne by a purchaser in commercial real estate transactions in the county where the Property is located. Seller and Purchaser shall each pay its respective costs for its own attorneys' fees for services related to the negotiation and preparation of this Agreement and the sale and purchase of the Property.

PSA (Philadelphia, PA - Summerdale Ave.)
4832-3299-3922.4

11.    **AD VALOREM TAXES.** Ad valorem taxes and assessments, if any, for the tax year in which the Closing occurs are to be prorated (on the basis of a 365-day year) as of the date of Closing on the basis of the tax assessment for the tax year in which Closing occurs. If the Closing shall occur before the tax assessment for the current tax year shall be established, the tax assessment for the preceding tax year shall be used for such proration at Closing. Should the tax assessment for the current tax year once known differ by greater than ten percent (10%) from the tax assessment used for such proration at Closing, either Seller or Purchaser may demand and shall be entitled to receive on demand a payment from the other correcting such proration within 90 days of the date in which such taxes are known. In the event the tax parcel(s) in which the Property is located contains any additional property as of the Closing Date, Seller and Purchaser agree to enter into a tax proration agreement at Closing, which shall provide, among other things, that (i) as soon as reasonably possible after Closing, the parties will diligently pursue until completion a tax parcel split that creates a separate tax parcel that includes the Property and no other property and (ii) in the event such tax parcel split is not effective prior to the delivery of any tax assessments following the Closing, each party will be responsible for its pro rata share of such assessment.  Seller shall be solely responsible for any and all roll back taxes or other deferred property taxes, if any, that are due or become due either before or after Closing.  If the same are reasonably known at Closing, any such roll back taxes shall be estimated and escrowed with Title Company (pursuant to an escrow agreement agreed to by Title Company) at Closing until a bill therefor has been presented.  Any excess funds shall be reimbursed back to Seller. The obligations in this Section 11 shall survive Closing and the delivery of the Deed.

12.    **SELLER'S REPRESENTATIONS AND WARRANTIES.** To induce Purchaser to enter into this Agreement, Seller makes the following representations and warranties, all of which are true as of the date hereof (unless otherwise specified) and shall also be true as of the Closing Date:

a.    Seller is the sole owner of fee simple title to the Property. Seller has the legal authority and capacity to enter into this Agreement and to sell the Property.  The execution and delivery of this Agreement and the performance by Seller of its obligations hereunder have been duly authorized by all requisite action and no further action or approval is required in order to constitute this Agreement as a binding and enforceable obligation of Seller. The execution of this Agreement by the Seller will not create a default of any kind for Seller, violate any restrictions which Seller is subject to, or violate any applicable code, resolution, law, judgment, regulation, statute, decree or rule.

b.    To Seller's actual knowledge, the Property is not and, for the past five (5) years, has not been subject to any special taxes or assessments of any kind or a special use valuation.

c.    No leases, options or other contracts for the Property have been granted or entered into which are outstanding as of the date of this Agreement, and no party other than Seller has any right of possession as to all or any part of the Property.

d.    There are no oral or written service, maintenance, employment or other similar contracts or agreements affecting the Property.

6

PSA (Philadelphia, PA - Summerdale Ave.)

4832-3299-3922.4

e.    There are no pending or, to Seller's actual knowledge, threatened condemnation or eminent domain proceedings for all or any part of the Property.

f.    No act or omission has occurred with respect to the Property and no materials or services have been furnished or delivered on or to the Property which would create or otherwise encumber the Property with any mechanics, materialmen, laborer, or other similar type of lien after the Closing.

g.    There is no pending or, to Seller's actual knowledge, threatened claim, litigation or other proceeding whether in a court of law or other venue that currently affects or potentially could affect the Property or Seller's right to convey the Property.

h.    To the best of Seller's knowledge, Seller and the Property are in compliance with all applicable laws, ordinances, regulations, statutes, rules and restrictions affecting the Property.

i.    To Seller's actual knowledge, neither Seller nor any previous owner, tenant, occupant or user of the Property, nor any other person, has engaged in or permitted any operations or activities upon, or any use or occupancy of the Property, or any portion thereof, for the purpose of or in any way involving the handling, manufacture, treatment, storage, use, generation, release, discharge, refining, dumping or disposal of any Hazardous Materials (as hereafter defined) in violation of any applicable laws or regulations on, under, in or about the Property, or transported any Hazardous Materials to, from or across the Property, nor are any Hazardous Materials presently constructed, deposited, stored, or otherwise located on, under, in or about the Property, nor have any Hazardous Materials migrated from the Property upon or beneath other properties, nor have any Hazardous Materials migrated or threatened to migrate from other properties upon, about or beneath the Property, nor are any underground improvements, including but not limited to storage tanks, dumps, or water, gas or oil wells now located or have ever been located on the Property.  As used herein, the term "Hazardous Materials" means:

i.    any substance the presence of which requires investigation or remediation under any federal, state or local statute, regulation, ordinance, order, action, policy or common law; or

ii.    any substance which is or becomes defined as a "hazardous waste," "hazardous substance," pollutant or contaminant under any federal, state or local statute, regulation, rule or ordinance or amendments thereto including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 et seq.) and/or the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.); or

iii.    any substance which is toxic, explosive, corrosive, flammable, infectious, radioactive, carcinogenic, mutagenic, or otherwise hazardous and is or becomes regulated by any governmental authority, agency, department, commission, board, agency or instrumentality of the United States, the Commonwealth of Pennsylvania or any political subdivision thereof; or

7

PSA (Philadelphia, PA - Summerdale Ave.)

4832-3299-3922.4

iv.      any substance the presence of which on the Property causes or threatens to cause a nuisance upon the Property or to adjacent properties or poses or threatens to pose a hazard to the health or safety of persons on or about the Property; or

v.      any substance the presence of which on adjacent properties could constitute a trespass by Seller; or

vi.      any substance, without limitation, which contains gasoline, diesel fuel or other petroleum hydrocarbons; or

vii.      any substance, without limitation, which contains polychlorinated bipheynols (PCBs), asbestos or urea formaldehyde foam insulation; or

viii.      without limitation, radon gas.

With respect to the representations and warranties contained in this Section 12, Seller agrees to indemnify, defend, reimburse and hold harmless Purchaser, its affiliates, successors and assigns from any and all liabilities, costs, damages and expenses (including without limitation, attorneys' fees) arising from or related to the breach of any material representation or warranty as to conditions existing on or prior to the Closing Date for a period ending one (1) year after the Closing.

13.      **PURCHASER'S REPRESENTATIONS AND WARRANTIES.** To induce Seller to enter into this Agreement, Purchaser makes the following representations and warranties, all of which are true as of the date hereof (unless otherwise specified) and shall also be true as of the Closing Date:

a.      Purchaser has the full right, power and authority to purchase the Property as provided in this Agreement and to carry out Purchaser's obligations hereunder, and all requisite action necessary to authorize Purchaser to enter into this Agreement and to carry out its obligations hereunder have been, or by the Closing will have been taken. This Agreement and all such documents when executed by Purchaser will be legal, valid and binding obligations of Purchaser and neither the execution nor the delivery of this Agreement, nor the consummation of the purchase and sale contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement conflict with or will result in the breach of any of the terms, conditions, or provisions of any contract or instrument to which Purchaser, or any member, shareholder, partner, or related entity or affiliate of Purchaser, is a party or by which Purchaser or any member, shareholder, partner or related entity or affiliate of Purchaser, or any of Purchaser's assets is bound.

b.      Purchaser is purchasing the Property for business or commercial investment.

c.      Purchaser has, or will have prior to the Closing Date, available funds to pay in full the Purchase Price and all anticipated Closing costs.

With respect to the representations and warranties contained in this Section 13, Purchaser agrees to indemnify, defend, reimburse and hold harmless Seller, its affiliates, successors and assigns from any and all liabilities, costs, damages and expenses (including without limitation,

8

PSA (Philadelphia, PA - Summerdale Ave.)

4832-3299-3922.4

attorneys' fees) arising from or related to the breach of any material representation or warranty as to conditions existing on or prior to the Closing Date for a period ending one (1) year after the Closing.

## 14.    DEFAULT.

a.    Default by Seller. In the event any of the specific representations, warranties or covenants of Seller contained in this Agreement proves to be untrue in any material respect, or if Seller refuses or fails to timely perform any of its duties or obligations or comply with any of the provisions hereof at or prior to Closing, then, at Purchaser's option, Purchaser may elect to (a) terminate this Agreement and receive a refund of the Earnest Money from Title Company within five (5) business days of written receipt by Title Company of a written request from Purchaser (with a copy going to Seller) or (b) proceed with any legal or equitable remedy available to Purchaser, including, without limitation, the right to monetary damages, and the right of specific performance.

b.    Default by Purchaser. In the event Purchaser refuses or fails to timely perform any of its duties or obligations or comply with any of the provisions hereof at or prior to Closing, then, if Seller is not in default as specified in the foregoing paragraph, Seller shall be entitled to the Earnest Money as full liquidated damages, the same being Seller's sole remedy, whereupon this Agreement and all rights and obligations created hereby shall automatically terminate and be null and void and of no further force or effect whatsoever. In this regard, the Title Company shall disburse the Earnest Money to Seller within five (5) business days of receipt by Title Company of a written request from Seller (with a copy going to Purchaser). It is agreed by Seller and Purchaser that, in the event of a breach by Purchaser, the amount of actual damages suffered by Seller would be expensive and difficult to ascertain and the retention of the Earnest Money as liquidated damages is a reasonable estimate of the parties of the actual damages to Seller herein and are not a penalty.

c.    Notice and Cure Period. With the exception of each party's obligation to close on the Closing Date, Purchaser shall take no action with respect to a Seller's default, and Seller shall take no action with respect to a Purchaser's default, until the non-defaulting party has given written notice to the defaulting party and the defaulting party has failed to cure the default for a period of 10 days after receipt of such notice.

## 15.    CONDEMNATION AND DESTRUCTION. If, on or prior to the Closing Date, any portion of the Property is the subject of a pending or contemplated taking by eminent domain which has not been consummated or if the Property has been materially damaged or destroyed, Seller shall notify Purchaser within five (5) days of obtaining knowledge of such fact, and Purchaser shall have the option to terminate this Agreement upon giving written notice to Seller within fifteen (15) days of receiving Seller's notice. In the event Purchaser shall elect to terminate this Agreement, Purchaser shall receive a refund of the Earnest Money within five (5) business days of receipt by Title Company of written demand (with a copy going to Seller), and neither party shall have any further rights or obligations hereunder. If, after receipt of Seller's notice, as aforesaid, Purchaser does not exercise its option to terminate this Agreement within the required fifteen (15) day period, the parties hereto shall remain bound hereunder and Seller shall assign and turn over at Closing, and Purchaser shall be entitled to receive and keep, all awards

9

for the taking by eminent domain described in said notice or all insurance proceeds payable as a result of such destruction or damage (and Purchaser shall receive a credit at Closing for any applicable deductible under the applicable insurance policy(ies)).  For purposes of this Section 15, the Property shall be deemed "materially" damaged or destroyed if the cost to replace or repair any such damage or destruction shall exceed Two Hundred Thousand Dollars ($200,000.00).

16.    **NOTICES.** All notices, requests, consents and other communications hereunder shall be in writing and shall be personally delivered, or delivered by overnight courier, or mailed by first class, registered or certified mail, return receipt requested, postage prepaid, or delivered by email (provided that a notice delivered by email shall promptly thereafter be delivered by one of the other methods permitted in this Section 16), as follows:

Notice to Purchaser:    SAFStor Real Estate Co, LLC
444 Seabreeze Blvd., Suite 840
Daytona Beach, FL 32118
Attention: Andrew Young
Email: andrew@safstor.com

with a copy to:    Bradley Arant Boult Cummings LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203
Attention: Dawn Helms Sharff
Phone:  205-521-8200
Email: dsharff@bradley.com

Notice to Seller:    4890 Summerdale Associates, LP
9835 Verree Road
Philadelphia, PA 19115
Attention: Joseph Gentile
Phone: 215-783-1675
Email: gentileconstr@aol.com

with a copy to:    JM LAW GROUP, LLC
1515 Market Street, Suite 1200
Philadelphia, PA 19102
Attn: Joshua M. Marks, Esq.
Phone: 215-832-3600
Email: josh@lawmr.com

Notice to
Title Company:    First American Title Insurance Company
National Commercial Services
30 North LaSalle St., Suite 2700
Chicago, IL 60602
Attention: John E. Beckstedt, Jr.

10

PSA (Philadelphia, PA - Summerdale Ave.)

4832-3299-3922.4

Phone: 312-917-7233
Email: jbeckstedt@firstam.com

Any such notice, request, consent or other communications shall be deemed received at such time as it is actually delivered (if personally delivered) or sent by email (if delivered by email), on the first business day following an overnight delivery, or on the fifth business day after a mailing, as the case may be. Either party hereto may change the address for receiving notices hereunder by notice sent in accordance with the terms of this Section 16. Notice may be given by counsel on behalf of either party.

17.    **BROKERS.** The parties warrant to each other that no broker is entitled to a commission on the sale and purchase of the Property hereunder and that each party will indemnify and hold the other party harmless of any demands, claims or other obligations asserted by any person for a brokerage commission through such party, except as follows:

Upon the closing of the transaction evidenced hereby, and not otherwise, (i) Seller shall pay a commission equal to six percent (6%) of the Purchase Price to G. Kevin Smith, III and Gerry Smith of Corporate Realty Partners & Co., Inc., as listing broker, and (ii) Purchaser shall pay a commission to Mike Dunn of Dunn & Associates pursuant to a separate agreement.

The provisions of this Section 17 shall survive Closing and any termination of this Agreement.

18.    **SELLER'S COVENANTS.** While this Agreement is in effect, Seller will not actively market, sell or encumber the Property in any manner, will not accept, negotiate or entertain any other offers for the Property and will maintain the Property in its current condition, reasonable wear and tear accepted, and in compliance with applicable laws. Seller shall not take any other action which would cause any representation, warranty or covenant set out herein to be untrue in any material respect as of Closing without Purchaser's prior written consent. Without the prior written consent of Purchaser, which may be granted or denied in Purchaser's sole and absolute discretion, Seller shall not enter into any oral or written service, maintenance, employment or other contracts, leases or agreements affecting the Property which would survive the Closing or otherwise affect the use, operation or enjoyment of the Property after the Closing; it being understood that Purchaser does not intend to take an assignment of any leases, service contracts or similar agreements at Closing.

19.    **MISCELLANEOUS.**

a.    Governing Law. This Agreement shall be governed by and interpreted by the internal laws of the Commonwealth of Pennsylvania, without regard to its conflicts of law provisions.

b.    Entire Agreement. This Agreement represents the entire agreement between Purchaser and Seller concerning the sale of the Property, and supersedes any other agreements or understanding whether written or verbal and may not be changed unless in writing and fully executed by both Purchaser and Seller.

11

c.    Further Assurances. Each party agrees that it will without further consideration execute and deliver such other documents and take such other action, whether prior or subsequent to Closing, as may be reasonably requested by the other party to consummate more effectively the purposes or subject matter of this Agreement.

d.    Time of the Essence. Both parties hereto specifically agree that time is of the essence to this Agreement with respect to the performance of the obligations of the parties under this Agreement.

e.    Assignment; Successors and Assigns. This Agreement may be assigned by Purchaser with Seller's consent (so long as the assignee assumes all of Purchaser's obligations hereunder and Purchaser promptly furnishes to Seller a copy of the fully executed assignment and assumption agreement), which such consent shall not be unreasonably withheld or delayed, and shall be binding upon and inure to the benefit of the parties hereto and their respective representatives, successors and assigns. Notwithstanding the foregoing, Purchaser shall have the right to assign its interest in this Agreement to a to-be-formed affiliate of Purchaser so long as the assignee assumes all of Purchaser's obligations hereunder and Purchaser promptly furnishes to Seller a copy of the fully executed assignment and assumption agreement. In the event that any assignment of this Agreement by Purchaser is deemed a taxable transfer or conveyance by the applicable local or state taxing authority, Purchaser shall pay any and all real estate transfer taxes associated with such assignment. Purchaser's obligation to pay any such real estate transfer taxes pursuant to this Section 19(e) shall survive Closing.

f.    Like Kind Exchange. Purchaser and Seller hereby acknowledge that Purchaser and/or Seller (the "Exchange Party") may desire to effectuate a tax-deferred exchange (also known as a "1031" exchange (the "Exchange")) in connection with the purchase and/or sale of all or a portion of the Property. Each party (the "Cooperating Party") hereby agrees to cooperate with the Exchange Party in connection with the Exchange contemplated by the Exchange Party, provided that:

(i)    All documents executed in connection with the Exchange (the "Exchange Documents") shall recognize that Cooperating Party is acting solely as an accommodating party to such Exchange, shall have no liability with respect thereto, and is making no representation or warranty that the transactions qualify as a tax-free exchange under Section 1031 of the Internal Revenue Code or any applicable state or local laws and shall have no liability whatsoever if any such transactions fail to so qualify. All Exchange Documents executed by Cooperating Party in connection with the Exchange shall be in form and substance reasonably acceptable to Cooperating Party.

(ii)    Such Exchange shall not result in Cooperating Party incurring any additional costs or liabilities (and Exchange Party shall pay all additional costs and expenses to the extent that such are incurred, including, without limitation, any additional costs or expenses incurred by Cooperating Party as a result of its participation in the Exchange). Exchange Party shall indemnify, defend and hold Cooperating Party harmless from and against all claims, demands, liability, losses, damages, costs and expenses (including reasonable attorneys' and accountants' fees) suffered or incurred by Cooperating Party in connection with the Exchange.

12

(iii)    In no event shall Cooperating Party be obligated to acquire any property or otherwise be obligated to take title, or appear in the records of title, to any other property in connection with the Exchange.

(iv)    In no event shall Exchange Party's consummation of such Exchange constitute a condition precedent to Exchange Party's obligations under this Agreement nor shall such Exchange modify any of the dates and times for performance set forth in this Agreement and Exchange Party's failure or inability to consummate such Exchange shall not be deemed to excuse or release Exchange Party from its obligations under this Agreement.

Purchaser and Seller further agree that, in connection with the foregoing, and subject in all respects to the foregoing provisions, Cooperating Party shall consent to Exchange Party assigning all or a portion of its rights under this Agreement to an exchange intermediary solely for the purpose of consummating such Exchange. In no event shall any such assignment release Exchange Party of its obligations under this Agreement or any document executed pursuant to the terms hereof, including, without limitation, its indemnity obligations hereunder, or affect in any manner any of Exchange Party's representations or covenants set forth in this Agreement.

g.    Captions and Interpretations. Paragraph titles or captions contained herein are inserted as a matter of convenience and for reference, and in no way define, limit, extend or describe the scope of this Agreement or any provision hereof. No provision in this Agreement is to be interpreted for or against either party because that party or its legal representative drafted such provision.

h.    Business Days. In the event any period of time provided for in this Agreement ends on a day other than a business day on which banks are generally open for a full day for business, such ending date shall automatically be extended to the next business day.

i.    Counterparts; Electronic/Facsimile Signatures. This Agreement may be executed in two or more separate counterparts, each of which, when so executed and delivered, shall constitute an original, and all such counterparts shall together constitute one and the same instrument, and any party may execute this Agreement by executing any one or more of such counterparts. Signatures delivered electronically or by facsimile shall be as binding as original signatures.

j.    Confidentiality. Except for those public disclosures required by applicable law, Seller hereby agrees that the matters contained herein and any information regarding the relationship between Purchaser and Seller, including any communications preceding the execution of this Agreement, shall remain confidential, and that Seller will not reveal to any third parties other than Seller's attorneys and other advisors the contents of this Agreement or the details of any such communications. Seller acknowledges that Purchaser will have all remedies available at law or in equity in the event of a breach of this subsection (j) by Seller or its affiliates.

k.    Attorneys' Fees. Should either party employ an attorney for the purpose of enforcing or construing this Agreement or any closing document, or any judgment, in any legal

13

proceeding whatsoever, including insolvency, bankruptcy, arbitration, declaratory relief or other litigation, the prevailing party shall be entitled to receive from the other party reimbursement for all reasonable attorneys' fees and all costs.

I.    Severability.  In the event any term or provision contained herein shall be held to be invalid or unlawful for any reason, such provision shall be deemed to be stricken from this Agreement, with the understanding that the remaining provisions hereof shall continue to be binding on the parties hereto.

**20.    INDEPENDENT CONTRACT CONSIDERATION.**  Within five (5) business days after the Effective Date, Purchaser will tender to Seller the sum of One Hundred Dollars ($100.00) as independent and non-refundable contract consideration for any options granted in this Agreement.  This independent consideration is in addition to any other deposits made under this Agreement, is earned by Seller upon receipt, and will not be credited against the Purchase Price.

**21.    TAX CLEARANCE CERTIFICATE.**  Seller represents and warrants as of the date hereof and as of the Closing Date that the Property does not constitute 51% or more of the real estate owned by Seller in the Commonwealth of Pennsylvania. If the Property does constitute 51% or more of the real estate owned by Seller in the Commonwealth of Pennsylvania or if otherwise required by law, Seller shall (a) file an Application for Tax Clearance Certificate with the appropriate state departments of Pennsylvania at least ten (10) business days prior to the Closing Date, (b) deliver a copy of the Tax Clearance Certificate to Purchaser promptly upon receipt from the appropriate state departments of Pennsylvania, (c) pay all taxes to the Commonwealth of Pennsylvania required to be paid by Seller and (d) comply with all other statutory requirements related to such Application. Seller agrees to indemnify, defend, reimburse and hold harmless Purchaser, its affiliates, successors and assigns from any and all liabilities, costs, damages and expenses (including without limitation, attorneys' fees) arising from or related to the breach of the foregoing representation and warranty or Seller's failure to comply with its obligations pursuant to this Section or any statutory requirements related to the Application for Tax Clearance Certificate.  The provisions of this Section 21 shall survive Closing.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

14

PSA (Philadelphia, PA - Summerdale Ave.)

4832-3299-3922.4

IN WITNESS WHEREOF, Purchaser and Seller have caused this Agreement to be executed as of the day and year first above written.

SELLER:

4890 SUMMERDALE ASSOCIATES, LP

By: _____
Name: _____
Title: _____

PURCHASER:

SAFSTOR REAL ESTATE CO, LLC

By: _____
Name: Andrew Young
Title: Sole Member

15

## JOINDER

First American Title Insurance Company hereby acknowledges the receipt of the initial Earnest Money described in the Agreement to which this Joinder is attached and agrees to hold all Earnest Money in accordance with the terms hereof, and in accordance with the terms of its Conditions of Escrow, a copy of which is attached hereto as Exhibit D.

**FIRST AMERICAN TITLE INSURANCE COMPANY**

By: _____

Name: _____

Title: _____

Date: _____

16

PSA (Philadelphia, PA - Summerdale Ave.)

4832-3299-3922.4

## Exhibit A

[Depiction of Property]



17

## Exhibit B

[Items to be provided by Seller]

(a) Copy of the most recent real estate tax bills for the Property;

(b) Results of any soil boring tests with respect to the Property;

(c) All existing surveys and topographical renderings of the Property;

(d) All environmental studies of the Property and any environmental permits or approvals with respect to the Property;

(e) Copies of any correspondence with federal, state, municipal and other governmental authorities with respect to the Property;

(f) Any site development and zoning documentation related to the Property;

(g) Copy of Seller's vesting deed and any existing title insurance commitment, title report or title policy for the Property; and

(h) Copies of any service contracts and architectural/engineering agreements and documentation with respect to the Property.

18

PSA (Philadelphia, PA - Summerdale Ave.)
4832-3299-3922.4

## Exhibit C

### [Seller's Deliverables at Closing]

(a)    A fully executed Deed;

(b)    An executed assignment of Seller's right, title and interest in and to all rights, credits, permits, approvals, authorizations and licenses relating to or affecting the Property, together with any and all entitlements, privileges, trips, square footage allocations, development approvals, land use approvals, impact fee credits, sewer rights, water rights and other development rights relating to or affecting the Property;

(c)    Fully executed versions of an owner's affidavit, lien waiver, or any other agreements, affidavits, or indemnities necessary for the purpose of removing the "standard" exceptions from Purchaser's owner's title insurance policy for the Property;

(d)    "Payoff Letters" with respect to all real estate liens or other instruments or agreements to be canceled pursuant to the terms of this Agreement;

(e)    Fully executed versions of any state and federal affidavits of residency reasonably required by Purchaser;

(f)    A fully executed certificate of non-foreign status to insure Seller's compliance with Foreign Investment in Real Property Tax Act ("FIRPTA") (Section 1445 of the Internal Revenue Code of 1986, as amended);

(g)    A closing statement executed by Seller;

(h)    Fully executed versions of any other documents as are reasonably required by the Title Company and Purchaser to evidence Seller's existence and authority to convey the Property to Purchaser, and as may be required to close;

(i)    Possession of the Property; and

(j)    Any other documents specifically contemplated in this Agreement.

19

PSA (Philadelphia, PA - Summerdale Ave.)
4832-3299-3922.4

## Exhibit D

### FIRST AMERICAN TITLE INSURANCE COMPANY
### CONDITIONS OF ESCROW

Except as specifically modified by the written escrow instruction(s) received and accepted by the Escrow Agent, the following Conditions of Escrow shall apply to this escrow or settlement.

1.      ESCROW AGENT: First American Title Insurance Company is herein referred to as the Escrow Agent.

2.      DEPOSIT OF FUNDS: All checks, money orders or drafts will be processed for collection in the normal course of business. Escrow Agent may commingle funds received by it in escrow with escrow funds of others, and may, without limitation, deposit such funds in its custodial or escrow accounts with any reputable trust company, bank, savings bank, savings association, or other financial services entity, including any affiliate of Escrow Agent. It is understood that Escrow Agent shall be under no obligation, except to the extent noted on Instruction For Investment of Escrow Funds form, to invest the funds deposited with it on behalf of any depositor, nor shall it be accountable for any earnings or incidental benefit attributable to the funds which may be received by Escrow Agent while it holds such funds. Deposits held by Escrow Agent shall be subject to the provisions of applicable state statutes governing unclaimed property.

3.      LIMITATIONS OF LIABILITY: Escrow Agent shall not be liable for any loss or damage resulting from the following item(s):

(a)      The effect of the transaction underlying this escrow including, without limitation, any defect in the title to the real estate, any failure or delay in the surrender of possession of the property, the rights or obligations of any party in possession of the property, the financial status or insolvency of any other party, and/or any misrepresentations of fact made by any other party;

(b)      The legal sufficiency of the document(s) purporting to transfer or otherwise encumber title to the real estate; provided, however, that this limitation of liability shall not affect the liability of First American Title Insurance Company under any title insurance policy which it has issued or may issue.

(c)      The default, error, act or failure to act by any other party to the escrow;

(d)      Any loss, loss of value or impairment of funds which have been deposited in escrow while those funds are in the course of collection or while those funds are on deposit in a depository institution if such loss, loss of value or impairment results from the failure, insolvency or suspension of a depository institution;

(e)      Any defects or conditions of title to any property that is the subject of this escrow provided, however, that this limitation of liability shall not affect the liability of First American Title Insurance Company under any title insurance policy which it has issued or may issue. NOTE: No title insurance liability is created by this agreement;

(f)      The expiration of any time limit or other consequences of delay, absent receipt of a properly executed escrow instruction, accepted by Escrow Agent, instructing the Escrow Agent to comply with said time limit; and

20

PSA (Philadelphia, PA - Summerdale Ave.)

4832-3299-3922.4

(g)    Escrow Agent's compliance with any legal process including, but not limited to, subpoena, writs, orders, judgments and decrees of any court whether issued with or without jurisdiction and whether or not subsequently vacated, modified, set aside or reversed.

(NOTE:  This paragraph shall not be construed to limit Escrow Agent's liability for its own gross negligence or willful misconduct.)

4.    DEFAULT AND/OR DISPUTES:  In the event any party to the transaction underlying this escrow shall tender any performance after the time when such performance was due, Escrow Agent may proceed under this escrow, unless one of the parties to this escrow shall give to the Escrow Agent a written direction to stop the further performance of the Escrow Agent's functions hereunder.  In the event of written notice of default or dispute is given to the Escrow Agent by any party, Escrow Agent will promptly notify all other parties of such notice.  Thereafter, Escrow Agent will decline to disburse funds or to deliver any instrument or otherwise continue to perform its escrow functions, except upon receipt of a mutual written agreement of the parties or upon an appropriate order of court.

5.    ACCOUNTING:  Escrow Agent shall account to the parties for all funds received and disbursed hereunder at the time of final settlement and closing of this escrow.  Escrow Agent shall not be liable for the accuracy of information furnished to it by other persons in the normal course of business, or the failure to adjust items not designated in writing.  Adjustment items shall be prorated on the basis of a calendar year and a thirty day month.  Escrow Agent shall account for adjustments, credits and charges of expense items according to the custom and usage of the community.  Absent specific written instructions to the contrary, signed approval of settlement statements or other accounting of funds shall constitute the authority to Escrow Agent to disburse funds as shown thereon, and deliver instruments held in escrow as set forth in the escrow instruments.  Upon completion of the disbursement of funds and delivery of instruments, Escrow Agent shall be released and discharged of its escrow obligations hereunder.

6.    FEES, CHARGES AND/OR OTHER EXPENSES:  Escrow Agent shall charge for its service hereunder in accordance with its current schedule of fees (which includes annual maintenance fees) unless otherwise provided.  Unless otherwise directed, such fees shall be charged to the buyer and seller equally. All fees, charges and expenses are due and payable at settlement and such amounts may be deducted by Escrow Agent from any funds held in escrow due to the party from whom such amounts are due and owing.  Additional amounts which may become due for any reason shall be promptly paid to Escrow Agent by the party owing such amounts.  Escrow Agent shall not be required to advance its own funds for any purpose provided that any such advance, made at its option, shall be promptly reimbursed by the party for whom it is advanced, and such optional advance shall not be an admission of liability on the part of Escrow Agent.

7.    APPLICABILITY:  These conditions of escrow shall apply to and be for the benefit of agents, if any, of the Escrow Agent so employed by it for services in connection with this escrow.

8.    ATTORNEYS' FEES:  In the event that litigation is initiated relating to this escrow, the parties hereto agree that Escrow Agent shall be held harmless from any and all attorneys' fees, court costs and expenses relating to that litigation to the extent that litigation does not arise as a result of the Escrow Agent's gross negligence or willful misconduct.  The parties hereto agree to indemnify Escrow Agent for all such attorneys' fees, court costs and expenses.

21

PSA (Philadelphia, PA - Summerdale Ave.)

4832-3299-3922.4

# EXHIBIT B

**Dawn Helms Sharff**
Partner
dsharff@bradley.com
205.521.8200 direct
205.352.6677 cell
205.488.6200 fax



February 12, 2019

<u>**VIA FEDERAL EXPRESS (OVERNIGHT)**</u>
<u>**AND EMAIL**</u>

4890 Summerdale Associates, LP
9835 Verree Road
Philadelphia, PA 19115
Attention: Joseph Gentile
gentileconstr@aol.com

Joshua M. Marks, Esq.
JM Law Group, LLC
1515 Market Street, Suite 1200
Philadelphia, PA 19102
josh@lawmr.com

Re:     **Purchase and Sale Agreement dated January 28, 2019 between 4890 Summerdale Associates, LP ("Seller") and SAFStor Real Estate Co, LLC ("Purchaser") (the "Agreement")**

<u>**NOTICE OF DEFAULT**</u>

Mr. Gentile:

My firm represents Purchaser with respect to the above-referenced Agreement. This letter is written notice of Seller's default under the terms of the Agreement and triggers Seller's 10-day cure period under Section 14.c. of the Agreement.

In the Agreement, Seller represented and warranted that it can "enter into this Agreement" and "sell the Property." Seller further represented and warranted that "[n]o leases, options or other contracts for the Property have been granted or entered into which are outstanding as of the date of this Agreement." And in the Agreement, Seller agreed that it "will not accept, negotiate or entertain any other offers for the Property."

We now understand that Seller is currently contractually obligated to sell the Property to another party. If that is the case, Seller is in breach of the above-referenced representations, warranties and covenants. Seller's breach is material and implicates the default provisions of the Agreement. Without timely, curative action by Seller, Purchaser will pursue all legal and equitable remedies available to it under the Agreement and Pennsylvania law, including without limitation, its right to compel specific performance, and/or damages, and to be reimbursed its reasonable attorney's fees in rectifying the breach and enforcing the Agreement. <u>Oliver v. Ball</u>, 136 A.3d 162, 167 (Pa. Super. 2016).

Purchaser continues to expect and demand Seller's strict compliance with all terms and conditions of the Agreement.

Very truly yours,

Dawn Helms Sharff

DHS/gm
cc:     Andrew Young

4826-6254-1703.1